408 S.E.2d 291

**STATE of West Virginia, Plaintiff
Below, Appellee,**

v.

**Cyrus Jonathan GEORGE, Defendant
Below, Appellant.**

**No. 19648.**

Supreme Court of Appeals
of West Virginia.

Submitted Jan. 16, 1991.

Decided July 11, 1991.

Dissenting Opinion of Chief Justice Miller
July 31, 1991.

Mario J. Palumbo, Atty. Gen., Joanna I. Tabit, Sr. Asst. Atty. Gen., K. Alan Perdue, Asst. Atty. Gen., for appellee.

Hugh Rogers, Jr., Kerens, for appellant.

WORKMAN, Justice:

This appeal arises before the Court from the Circuit Court of Upshur County where a jury convicted the appellant of malicious assault and attempted murder of the same victim, resulting in a September 8, 1989, final order wherein a sentence of two consecutive terms of two to ten years and one to five years respectively was imposed. The appellant asserts the following errors were committed by the lower court: 1) the punishment for attempted murder and malicious assault on the same victim put the appellant twice in jeopardy for the same offense; 2) the appellant's statements to officers who questioned him in a coercive setting without *Miranda*[1] warnings should have been suppressed; and, 3) the evidence from appellant's truck should have been suppressed, where allegations contained in the affidavit supporting the warrant were either false or stale. Upon review of the briefs and arguments of counsel, the record and all other matters before this Court, we find no errors were committed by the court below and accordingly affirm that court's decision.

On November 14, 1986, at approximately 5:30 p.m., three gun shots were fired at Dallas Rice as he walked away from an outbuilding near his home. One of the shots entered his back, causing four broken ribs and a collapsed lung, and exited through his chest area. The victim testified at trial that he never saw his assailant.

Deputy Michael Kelley, a deputy sheriff for Upshur County called to investigate the shooting incident by Sheriff Gaudet, testified that he arrived at the scene at approximately 6:25 p.m. Using a bloodhound, he picked up a track on top of a hill across the road from the victim's home near some rock ledges. The dog led the deputy to a primitive road known as Calico Road on the other side of the hill and adjacent to the area from which it was believed the shots were fired. The deputy testified that while the dog was leading him up Calico Road, he encountered a vehicle being driven by the defendant. According to the deputy's testimony, "the dog went up to the vehicle and

---

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

put his paws up on the bumper and looked up over the hood...." The deputy who was the first to encounter the defendant pulled the dog off the vehicle and permitted the defendant to proceed. The deputy did not stop and question the defendant at that time.

The testimony of Sheriff Gaudet revealed that, upon his arrival at the scene around 6:00 p.m., he and Trooper Terrence M. Snodgrass proceeded to drive up Calico Road based upon information from people at the crime scene that no one had been seen leaving Calico Road.[2] As the officers were travelling on Calico Road, they encountered a red pickup truck driven by the defendant. This encounter, according to Sheriff Gaudet's testimony, occurred around 7:11 p.m. The sheriff testified that he turned on his blue lights and stopped in the narrow road. The defendant was ordered out of his vehicle and was searched for weapons. The sheriff at that time told the defendant that he was not under arrest; however, he was asked to submit to polygraph and paraffin tests.[3] It is undisputed that at this time, the defendant made various statements to the officers which were subsequently introduced at trial and the defendant did verbally give the officers permission to search his truck.[4] Finally, the officers instructed the defendant that they would follow him to the bottom of the road where he would be met by additional officers. Once there, pictures were taken of both the defendant and his truck. Deputy Lewis Anderson from the Upshur County Sheriff's Department testified that these photographs were taken between 7:30 and 8:00 p.m.

The defendant was not arrested until February 5, 1987, some three months after this initial encounter with police. At the time of his arrest, Deputy Lewis Anderson obtained a search warrant and conducted a search of the defendant's pickup truck for clothes, weapons, ammunition, tires and hacksaws. Among the items seized by Deputy Anderson as a result of this search were three hacksaw blades.

At trial, the testimony of Deputy Anderson revealed that on November 18, 1986, during a search of the crime vicinity, commonly known as the Ten Mile area[5], the stalk portion of a gun containing the model number 94 and the serial number was found. The deputy also discovered a portion of the gun's magazine. He also testified that he found a small pile of metal fragments "like little metal shavings that a hack saw sawing something in two would leave." Finally, the deputy testified that he tracked down the serial number of the gun portion he had found during his search. The serial number was located in records obtained from a country store at Ellamore, West Virginia. That serial number matched the serial number on a Winchester Model 94 which had been sold to a John S. George in 1973.[6]

The testimony of F.B.I. Special Agent Robert W. Sibert, an expert in the field of firearms and tool mark identification, revealed that the hacksaws found in the defendant's pickup truck matched a broken hacksaw blade found near Calico Road at the time of the shooting. Further, the expert testified that all the sawed gun fragments found near the crime scene came from the same gun and that the cutting was consistent with the type of

2. The sheriff testified that
[a]t that point from interviewing people there at the scene we found that, myself and ... [Trooper] Snodgrass at that point that no one had seen any vehicles coming down what was called—it wasn't known to me at that time but what's known to me now as the Calico Road which would have been the road adjacent or back of where we suspected the shooting scene or the suspect shot from.
. . . .
Officer Snodgrass and myself got into the four wheel drive and proceeded to go up this Calico Road.

3. The defendant originally consented to both of these tests, but revoked his consent prior to taking either test.

4. Sheriff Gaudet conducted this initial search of the defendant's truck.

5. The Ten Mile area included Calico Road.

6. A stipulation entered into evidence at trial revealed that in 1984 John S. George had legally changed his name to Cyrus Jonathan George.

cutting done by a hacksaw blade. While the expert referred to cutting done by hacksaw blades generally, he did testify that the hacksaw blade found during the search of the crime vicinity near Calico Road had originally been painted yellow and that he had observed yellow paint smears on the cut end of one of the gun portions he examined. Another F.B.I. expert in the field of paint analysis testified that the yellow paint on the gun portion matched the paint on the hacksaw blades found in the defendant's truck. Additionally, all of the portions of the gun which Special Agent Sibert examined were consistent with the type which would come from a Winchester Model 94 lever action rifle, which was the type of weapon believed to have been used in the shooting. Finally, Special Agent Sibert identified bullet fragments and a big bullet part recovered from a tire at the shooting scene as having rifling characteristics typical of those left by a Winchester Model 94.

The defendant took the stand and denied any involvement in the shooting incident.[7] A defense witness, Carl Sperry, testified that he had bought the gun allegedly used in the shooting from the defendant approximately seven months prior to the commission of the crime. There was also a "receipt" for the gun produced at trial by Sperry which was essentially a piece of paper signed by Sperry with the serial number of the weapon on the paper.[8] The witness testified further that he had lost the weapon while on a camping trip in June 1985, some sixty miles from where the gun fragments were found.

At the close of presentation of all the evidence in the case, a jury convicted the defendant for malicious assault and attempted murder.

## DOUBLE JEOPARDY

The first assignment of error raised by the defendant is that his convictions for both malicious assault and attempted murder in the first degree violate the proscription of double jeopardy found within article III, section 5 of the West Virginia Constitution.[9] Specifically, the defendant maintains that he is being punished twice for essentially committing identical crimes.[10] The state, on the other hand, asserts that no violation of double jeopardy principles have occurred since the defendant was convicted of two separate and distinct crimes.

In *State v. Zaccagnini*, 172 W.Va. 491, 308 S.E.2d 131 (1983) this Court, following precedent set forth by the United State Supreme Court, enunciated the appropriate test to be utilized in determining whether one or two offenses exist for dou-

---

7. While the victim never was asked if he knew his assailant personally, the defendant did testify that he knew the victim from having worked with him in Virginia in 1985. The defendant's testimony indicated that he had brought a clothes dresser back to West Virginia for the victim and delivered it to his home. The victim, however, lived at a different location at the time and according to the defendant's testimony he had no knowledge that the victim had moved.

8. As the court stated outside the presence of the jury: "My understanding when you buy a gun from someone and pay them $100, the person gets the receipt that paid the $100 but it's signed by the person who sold the gun and received the money. This man gave himself a receipt?"

9. Article III, section 5 of the West Virginia Constitution, in pertinent part, states "nor shall any person, in any criminal case, ... be twice put in jeopardy of life or liberty for the same offence."

10. The defendant's reliance upon our decisions in *State v. Neal*, 179 W.Va. 705, 371 S.E.2d 633

(1988) (per curiam) and *State ex rel. Johnson v. Hamilton*, 164 W.Va. 682, 266 S.E.2d 125, *cert. denied*, 449 U.S. 1036, 101 S.Ct. 613, 66 L.Ed.2d 498 (1980), *overruled in part on other grounds, State ex rel. Watson v. Ferguson*, 166 W.Va. 337, 274 S.E.2d 440 (1980) as support for this contention is tenuous at best. In *Neal*, the defendant's indictment included felonious assault and attempted murder of the same individual. The facts indicated that the attempted murder charge was dismissed during trial; however, there is no discussion on why the count was dismissed. 179 W.Va. at 708, 371 S.E.2d at 636. Additionally, in *Hamilton*, we, in dicta, seemed to suggest that malicious wounding is a lesser included offense of murder and that a person cannot be punished for the lesser included offense and the greater offense also. 164 W.Va. at 687–688, 266 S.E.2d at 128. This conclusion, however, was reached without any supporting authority and was not elevated to syllabus point status. Further, malicious wounding was being

ble jeopardy purposes: " '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one[,] is whether each provision requires proof of an additional fact which the other does not.' " *Zaccagnini*, 172 W.Va. at 501, 308 S.E.2d at 141 (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)) and Syl.Pt. 8. Before applying this test to the present case, it is important to first define the elements of each of the offenses involved.

■ West Virginia Code § 61–2–9 (1978), in pertinent part, defines malicious assault as follows:

> (a) If any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury with intent to maim, disfigure, disable or kill, he shall, except where it is otherwise provided, be guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary not less than two nor more than ten years.

Further, criminal attempt[11], in relevant part, is defined by W.Va.Code § 61–11–8 (1966):

> Every person who attempts to commit an offense, but fails to commit or is prevented from committing it, shall, where it is not otherwise provided, be punished as follows: If the offense attempted be punishable with life imprisonment, the person making such attempt shall be guilty of a felony, and, upon conviction, shall be confined in the penitentiary not less than one nor more than five years.

Finally, first degree murder is defined by W.Va.Code § 61–2–1 (1987)[12] which in pertinent part provides: "Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, sexual assault, robbery or burglary, is murder of the first degree."

Based upon these statutes, the jury was instructed that malicious wounding required the state to prove that: 1) the defendant; 2) did unlawfully and maliciously; 3) shoot the victim; 4) causing bodily injury to the victim; 5) with the intent to permanently maim, disfigure, disable, or kill the victim. In contrast attempted murder in the first degree required the state to prove that: 1) the defendant; 2) did unlawfully, intentionally, willfully, maliciously, and premeditatedly, or by lying in wait; 3) attempt to kill; 4) the victim.

Consequently in applying the test enunciated in *Zaccagnini* of "whether each provision requires proof of an additional fact which the other does not" we must conclude that two separate offenses exist. 172 W.Va. at 493, 308 S.E.2d at 133, Syl.Pt. 8. This becomes quite clear in that malicious assault requires proof of serious bodily injury which is not a requirement of attempted murder in the first degree. Attempted murder on the other hand requires proof of premeditation or lying in wait along with a specific intent to kill and an overt act toward the commission of the crime, which malicious assault does not require.

Other jurisdictions are in agreement with our finding that malicious assault is a separate and distinct offense from attempted murder in the first degree. For instance, in *State v. Sharpe*, 195 Conn. 651, 491 A.2d 345 (1985), the Supreme Court of Connecticut was asked to determine whether the defendant's punishment for both attempted murder and assault in the second degree arising out of the same transaction violated double jeopardy.

The Connecticut Supreme Court was presented with a factual scenario similar to the one in the instant case. A victim was shot and injured when the defendant walked in front of the victim's vehicle and

---

analyzed in relation to murder and not attempted murder.

**11.** We held in syllabus point 2 of *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978) that "[i]n order to constitute the crime of attempt, two requirements must be met: (1) a specific intent to commit the underlying substantive crime; and (2) an overt act toward the commission of that crime, which falls short of completing the underlying crime."

**12.** West Virginia Code § 61–2–1 was amended in 1991. The amendments, however, do not effect the outcome of this case.

fired a gun at him as he backed out of his driveway. The defendant then proceeded to the driver's side of the car where he again fired several shots at the victim. The defendant fled the scene but was later apprehended and positively identified by the victim. *Sharpe*, 491 A.2d at 348.

The Supreme Court of Connecticut, applying the same United States Supreme Court test adopted by this Court in *Zaccagnini*, found that the defendant had not been punished *twice* for the same crime. *Id.* at 349. The *Sharpe* court reasoned that

> [a] conviction for attempted murder requires proof of intentional conduct constituting a substantial step toward intentionally causing the death of another person. . . . No showing of actual injury is required. Conversely, a conviction for assault in the first degree requires proof that the defendant actually caused serious physical injury to another person. No showing of intent to cause death is necessary. Therefore, each offense requires proof of a fact which the other does not.

*Id.* (citation omitted); *see State v. Davis*, 580 A.2d 163 (Me.1990); *State v. Worl*, 58 Wash.App. 443, 794 P.2d 31, *review granted on other grounds*, 115 Wash.2d 1022, 804 P.2d 9 (1990).

Therefore, we hold that a defendant may be convicted for both malicious assault and attempted murder in the first degree without violating the proscription against double jeopardy found within article III, section 5 of the West Virginia Constitution since the provisions for each offense require proof of an additional fact which the other does not.

## DEFENDANT'S STATEMENTS

The defendant's next contention is that the statements he made to law enforcement officers after the shooting should have been suppressed by the lower court since, they were made in a coercive setting without *Miranda* warnings. Specifically, the defendant argues that the following four statements were improperly admitted by the trial court after an in camera hearing [13] was conducted on the voluntariness issue:

1) "I don't have a gun. Go ahead and search my truck. I give you permission."

2) "I didn't hear any shots."

3) "I was tracking a bear."

4) "I took my wife to the doctor and got back about two p.m. I was parked down there looking at the river."

The defendant alleges that when he was stopped by Sheriff Gaudet and Trooper Snodgrass, the two officers with guns drawn [14] ordered him out of his vehicle. The defendant further testified that they put him in front of his truck, with his hands on the hood, while they searched him. Then, according to the defendant, he was held in the police vehicle with Trooper Snodgrass while the sheriff conducted a search of the defendant's vehicle.[15] Finally, the defendant testified that the officers proceeded to interrogate him about his business in the area and where he had travelled on Calico Road.

The state asserts that the defendant's statements were properly admitted since the defendant was not in custody at the time the statements were made. Particularly, Sheriff Gaudet testified that subsequent to instructing the defendant to get out of the car and place his hands on the hood, the defendant responded: " 'I don't have a gun. Go ahead and search my truck.' " Following that the sheriff testified that "[o]ne . . . [of us] asked him 'what are you doing here and why are you here?' " The defendant responded, " 'I was tracking a bear and had been tracking

---

**13.** The trial court found that "he [the defendant] was not in custody. He had not been arrested. He had not been Mirandized because he was not in custody and these statements are admissible."

**14.** Sheriff Gaudet did testify that he and Trooper Snodgrass "could have" had their guns drawn but "I don't believe we did but we could have."

**15.** It is undisputed that the search of the defendant's vehicle was done with the defendant's consent.

a couple of days.' " Further, the sheriff indicated that the defendant's statement as to not having heard any shots was not in response to any questions of the officers,[16] but rather was made spontaneously. Finally, the only statement made by the defendant while he was in the police vehicle was the one in which he stated that he had taken his wife to the doctor and returned around 2:00 p.m. The sheriff then testified that "I asked, I said, were you or was your truck down towards the river back down from the area we came from. He said, yes, he was parked down there looking at the river."

■ It is clear that in this jurisdiction *Miranda* warnings are required only when a suspect has either been "formally arrested *or* subjected to custodial interrogation." Syl.Pt. 1, in part, *State v. Preece*, 181 W.Va. 633, 383 S.E.2d 815 (1989) (emphasis added). Further, the ultimate inquiry which must be resolved by the trial court when ruling on a motion to suppress statements due to an officer's failure to give *Miranda* warnings is "whether the statement was the result of custodial interrogation." Syl.Pt. 2, in part, *Preece*, 181 W.Va. at 634, 383 S.E.2d at 816. In resolving this issue where the custody question is not clear "[t]he sole issue before a trial court . . . is whether a reasonable person in the suspect's position would have considered his or her freedom of action curtailed to a degree associated with a formal arrest." *Id.* 181 W.Va. at 634, 383 S.E.2d at 816, Syl.Pt. 3. Finally, this Court listed factors which the trial court should consider in making a determination of whether or not the suspect was in custody:

> [T]he location and length of the questioning; the nature of the questioning as it relates to the suspected offense; the number of police officers present; the use or absence of force or physical restraint by the police officers; the suspect's verbal and nonverbal responses to the police officers; and the length of

time between the questioning and formal arrest.

*Id.* 181 W.Va. at 642, 383 S.E.2d at 823–24.

■ In this case, it is evident that the defendant was not held for any lengthy period of time, and the questions were investigatory [17] in nature. While the defendant was asked to get into a police vehicle, the trooper testified that he was asked to do so only because "it was rather chilly", and Sheriff Gaudet testified it was "pitch dark." Furthermore, the defendant was not placed under arrest until some three months after this encounter.

■ " 'A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence.' " *Id.* 181 W.Va. at 634, 383 S.E.2d at 816, Syl.Pt. 4 (quoting Syl.Pt. 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d 146 (1978)); *accord* Syl.Pt. 5, *State v. Gibson*, 181 W.Va. 747, 384 S.E.2d 358 (1989). Based upon a review of the facts in this case, we conclude the trial court's ruling was not "plainly wrong or clearly against the weight of the evidence" in this case. *Id.*

### SEARCH WARRANT

The defendant's final assignment of error is that the evidence from the truck should have been suppressed because allegations in the search warrant affidavit were either false or stale.

In resolving the defendant's claim that the information contained in the affidavit for the search warrant was stale, we turn to the decision that the United States Supreme Court rendered in *Sgro v. United States*, 287 U.S. 206, 53 S.Ct. 138, 77 L.Ed. 260 (1932). The Court in *Sgro* held that proof of probable cause for the issuance of a search warrant "must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof

---

**16.** Trooper Snodgrass testified that this statement was made only after Sheriff Gaudet had informed the defendant that there had been a shooting in the Ten Mile area.

**17.** " 'General on-the-scene questioning as to facts surrounding a crime or other general question-

ing of citizens in the factfinding process is not affected by our holding.' " *Preece*, 181 W.Va. at 638, 383 S.E.2d at 820 (quoting *Miranda*, 384 U.S. at 477, 86 S.Ct. at 1629).

meets this test must be determined by the circumstances of each case." *Id.* at 210–11, 53 S.Ct. at 140–41.

Likewise this Court in *State v. Simmons,* 171 W.Va. 722, 301 S.E.2d 812 (1983) was presented with a staleness issue by a defendant who had been convicted of possession of marijuana with intent to deliver. The defendant argued that the affidavit supporting a search warrant for his residence contained stale information. 171 W.Va. at 725, 301 S.E.2d at 814. The alleged stale information concerned a drug sale that had occurred some thirty-three days earlier. *Id.* This Court concluded that "the affidavit contain[ed] sufficient allegations of a continuing course of conduct to establish the requisite probable cause to believe that contraband would be found at the appellant's residence...." *Id.*

■ In the present case, the fact that law enforcement waited for approximately three months to present a magistrate with an affidavit showing probable cause for the search warrant does not create a staleness problem under the circumstances of this case. The defendant was stopped while driving the same pickup truck that was the subject of this search shortly after the shooting occurred. It was undisputed that the sheriff himself searched the truck for weapons on the day of the shooting and at that time saw a tool box. Further, Deputy Anderson (the officer who signed the affidavit for a search warrant) testified at trial that he knew that the defendant was an electrician by trade and as a result it was believed that he would carry tools on a regular basis. At the preliminary hearing in this case held February 20, 1987, Deputy Anderson testified that the results of the FBI tests on the physical evidence had been turned over to the sheriff. Consequently, the delay between the commission of the crime and the presentation of the affidavit to the magistrate was due to an ongoing investigation based on physical evidence found in a search conducted of the crime scene, and it was not until the forensic results were received that the significance of what had earlier been observed created the kind of probable cause necessary to support a search warrant. Therefore, we find no merit to the staleness issue raised by the defendant.

■ Next, is the defendant's claim that allegations in the search warrant were false. At issue is the following statement made by Deputy Anderson in an affidavit supporting a search warrant for defendant's truck: [18]

the said Cyrus J. George was found in the immediate area at or near the time of said shooting in the above mentioned vehicle; affiant has knowingly [sic] that the said Cyrus J. George has carried the above items in said truck: The affiant is of the belief that the above vehicle was used in the commission of said offense and was being operated by the said Cyrus J. George at the time of said offense.

Subsequent to the search of the defendant's truck conducted by Deputy Anderson, the deputy testified as follows in response to questioning by the defendant's attorney at the preliminary hearing:

Q: In your affidavit for the search warrants you indicated that you had knowledge that John George had carried various items in his truck at one point in time.

. . . .

Q: ... You indicated to Magistrate Warner on February 5th that you were looking for a high powered rifle, cartridges, bullet cases, boxes, brass, other firearms, etcetera. And you also indicated that Mr. George had a '79 Ford truck, red in color, and that you further based the warrant on the fact that you had seen, or Mr. George had seen in the vicinity of the shooting back on the 14th. But you also indicated you had, I guess, knowledge of some kind that he carried these items in his truck in the past. And my ques-

18. The items listed in the search warrant were as follows: "Any high powered rifles, cartridges, bullets, cartridge cases or boxes[,] expended bullets, all other firearms, ammunition or accesso-ries including reloading components and equipment; hacksaws; clothing and footwear; and tires located on the 1979 Ford Truck; red in color; Registered to John S. George."

tion would be, what knowledge did you have?

A: That knowledge that I have is of the residence, of that type of gun being in the residence.

Q: So you really had no knowledge that any of these items had ever been carried in his truck?

A: No.

At the suppression hearing prior to trial, the trial court after hearing argument from both sides concluded that the allegation of the officer in the affidavit that the officer had knowledge that the items were in the defendant's truck should be disregarded; however, the court went on to state the following:

Well, I find that it's sufficient, the affidavit and search warrant. The Magistrate Warner had probable cause to issue the search warrant.

It says the vehicle that they wanted the search warrant for was found in the immediate area at or near the time of the shooting.

And that he believed that was used in the commission of the offense and it was operated by the Defendant.

How much stronger evidence could the law enforcement officer have to search that particular vehicle? Of course searching it three months later, he's taking a chance on what might or might not have been in at the time.

In *State v. Thompson*, 178 W.Va. 254, 358 S.E.2d 815 (1987) we discussed the effect of false allegations in search warrant affidavits. Essentially, what must occur is that the "false material must be excluded from an affidavit, and the affidavit's remaining contents must then be sufficient to establish probable cause." 178 W.Va. at 256, 358 S.E.2d at 817 (citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)). This procedure was followed by the trial court during the suppression hearing and even with the deletion of the false allegation, the trial court found sufficient evidence to warrant a finding of probable cause. We find no error in the trial court's ruling.

Based upon the foregoing, the decision of the Circuit Court of Upshur County is hereby affirmed.

Affirmed.

MILLER, Chief Justice, dissenting:

I depart from the majority opinion on the double jeopardy issue. Taken in the light most favorable to the State, the evidence presented at trial demonstrated that the defendant below fired the shots that seriously wounded Mr. Rice from a place of concealment and then tried to hide the evidence of his crime. There is no reason to dispute the jury's finding that this act was committed with the premeditation, malice, and intent to kill necessary to support a conviction for attempted first-degree murder. The same evidence, however, supports the conviction for malicious wounding.

In similar circumstances, other courts have found double jeopardy to bar multiple trials and punishments. In *Carawan v. State*, 515 So.2d 161 (Fla.1987), for example, the court found that a defendant who had fired a shotgun as many as four times at the victim, wounding him once, could not be punished for both attempted manslaughter and aggravated battery. *See also Davis v. State*, 559 So.2d 707 (Fla.App. 1990). In *Rivera v. State*, 547 So.2d 140 (Fla.App.1989), *review denied*, 558 So.2d 19 (Fla.1990), the court held that the defendant's convictions for aggravated child abuse, aggravated battery, and attempted first-degree murder violated double jeopardy where all three charges arose out of the defendant's single act of choking an eleven-year-old child. And in *Hughett v. State*, 557 N.E.2d 1015 (Ind.1990), the court held that where, in the course of a brawl, the defendant stabbed the victim several times, inflicting potentially life threatening wounds, the crimes of battery resulting in serious bodily injury and battery with a deadly weapon were included offenses of the crime of attempted murder. *See also Guardado v. State*, 562 So.2d 696 (Fla. App.), *review denied*, 576 So.2d 287 (Fla. 1990); *People v. Parks*, 8 Cal.App.3d 698, 87 Cal.Rptr. 419 (1970), *vacated on other*

*grounds,* 4 Cal.3d 955, 95 Cal.Rptr. 193, 485 P.2d 257 (1971); *Brown v. Commonwealth,* 222 Va. 111, 279 S.E.2d 142 (1981).

The cases cited by the majority are not necessarily in conflict. In *State v. Sharpe,* 195 Conn. 651, 491 A.2d 345 (1985), the defendant was charged with first-degree assault and attempted murder based on the fact that he had fired once from the front of the victim's vehicle, then walked to the driver's side of the vehicle and fired five or six more shots at the victim. In *State v. Worl,* 58 Wash.App. 443, 794 P.2d 31, *review granted,* 115 Wash.2d 1022, 804 P.2d 9 (1990), the defendant was convicted of malicious harassment[1] and attempted second-degree murder for making derogatory racial comments to the victim, threatening him, and striking him before finally stabbing him several times. In each case, there is an initial instance of violence for a purpose other than murder and a subsequent instance of violence from which it can be said that the perpetrator's purpose has become to kill the victim. There is a distinct end to the lesser crime and a distinct beginning to the second offense.[2]

Here, there is no such distinction between the acts of violence. The acts giving rise to the malicious wounding charge are the same acts that prove attempted murder. Quite simply, the defendant could not have intended to kill Mr. Rice and have attempted to do so in the manner described at trial without, at the same time, having committed the crime of malicious wounding. *See People v. Brown,* 81 A.D.2d 674, 438 N.Y.S.2d 577 (1981). *See also Hughett v. State,* 557 N.E.2d at 1017 ("Battery is not an inherently included offense of attempted murder, but where, as here, the charging instrument alleges attempted murder by means of infliction of a wound, battery is an included offense.").

It is unfortunate that the majority, instead of following what appears to be the majority view, elects to accept a cramped minority view on this double jeopardy issue.

1. Wash.Rev.Code Ann. § 9A.36.080 (1984) defines "malicious harassment" as causing or attempting to place another in fear of personal injury or property damage "maliciously and with the intent to intimidate or harass another person because of that person's race, color, religion, ancestry, national origin, or mental, physical, or sensory handicap."

2. *State v. Davis,* 580 A.2d 163 (Me.1990), cited by the majority, states only minimal facts, which makes it difficult to analyze.