784 S.E.2d 743

**STATE of West Virginia, Plaintiff Below, Respondent**

**v.**

**Chris Wade FLEMING, Defendant Below, Petitioner.**

No. 14–1141.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 20, 2016.

Decided March 7, 2016.

46

Jonathan G. Brill, Esq., Jonathan G. Brill, PLLC, Romney, WV, Lary D. Garrett, Esq., Garrett & Garrett, Attorneys at Law, Moorefield, WV, Co–Counsel for Petitioner.

Patrick Morrissey, Esq., Attorney General, Derek A. Knopp, Esq., Assistant Attorney General, Charleston, WV, Counsel for Respondent.

WORKMAN, Justice:

This is an appeal by Chris Wade Fleming (hereinafter "the petitioner") from a jury conviction of twelve counts of wanton endangerment, one count of attempted murder, and one count of fleeing in reckless indifference to the safety of others. The petitioner appeals the trial court's denial of a new trial. Upon thorough evaluation of the arguments of counsel, the record, and pertinent authority, this Court affirms the decision of the trial court.

## I. Factual and Procedural History

On September 3, 2012, the petitioner engaged in an argument with his wife and stepdaughter. He departed the family home and drove his Jeep through the yard of Jason Ludwick, a resident of Capon Bridge, West Virginia. Mr. Ludwick observed the petitioner driving through his property and pursued him in his own vehicle. The petitioner stopped along the road and threatened to shoot Mr. Ludwick, and Mr. Ludwick thought he heard a gunshot as he departed. Mr. Ludwick drove approximately one mile and stopped at the home of Brian Slade. At Mr. Ludwick's request, Mr. Slade called 911 and reported the encounter between the petitioner and Mr. Ludwick. As Mr. Ludwick proceeded toward his own home, he passed the petitioner and heard more gunshots.

Unbeknownst to Mr. Ludwick, his wife had left their residence to search for him. According to her subsequent testimony, when Mrs. Ludwick encountered the petitioner parked beside the road in his Jeep, he informed her that Mr. Ludwick was in the river. He then pointed his rifle at her and threatened to shoot her in the face. Mrs. Ludwick went home and called 911, believing her husband might have been shot and placed in the river.

Mr. Slade also left his residence in an attempt to locate the petitioner. He observed the Jeep and followed it to obtain its license number. The petitioner stopped and exited the vehicle with a rifle in his hand. As Mr. Slade turned to drive away, bullets hit his vehicle.

Hampshire County Sheriff's deputies arrived shortly thereafter and pursued the petitioner. When the petitioner turned his vehicle to face the police, he exited his vehicle, approached the officers, and fired his weapon. The petitioner surrendered after one of the deputies fired at him. He was cooperative throughout the ensuing investigation and indicated he could not recall the exact details of the events.

The petitioner was indicted on January 3, 2013, and filed a notice of mental defense on January 16, 2013, citing his post-traumatic stress disorder (hereinafter "PTSD") ac-

quired during his military service in the Iraq war.[1] On March 14, 2013, the trial court ordered a psychological evaluation of the petitioner's competency to stand trial. Gregory Trainor, the court-appointed evaluator and licensed psychologist, submitted an April 29, 2013, report (hereinafter "Trainor report") finding the petitioner competent to stand trial but unable to comprehend the nature or quality of his criminal behavior due to PTSD. The Trainor report found the petitioner's capacity to appreciate the wrongfulness of his behavior was moderately to severely diminished.

During a July 1, 2013, pretrial hearing, the parties advised the trial court of ongoing negotiations toward a plea agreement, whereby the petitioner would plead guilty by reason of insanity. At that time, the parties advised the court that they were continuing to discuss the number of counts to be included in the plea agreement. The State further advised the trial court that it was not likely to rebut the petitioner's temporary insanity defense. At the conclusion of that hearing, the trial court indicated its uncertainty about accepting such a plea and continued the matter in order to conduct further research.

Another hearing was held on July 9, 2013. On appeal, the petitioner asserts that he was prepared to enter his plea at that hearing, pursuant to a written agreement with the State. However, the petitioner did not make a motion for the court to consider a proposed plea agreement. At the outset of the hearing, the trial court ordered the petitioner to undergo a second evaluation for assessments of competency and criminal responsibility. The trial court had arranged for an examination of the petitioner by psychiatrist, Dr. Thomas Adamski.

Dr. Adamski submitted a September 4, 2013, report (hereinafter "Adamski report") finding the petitioner *both* competent to stand trial *and* criminally responsible for his conduct. Based on Dr. Adamski's report, the State ultimately withdrew its plea offer. An October 16, 2013, hearing was conducted on

the petitioner's motion for a Rule 11 plea hearing.[2] The petitioner argued the trial court had abandoned its impartial role and impermissibly participated in the plea bargaining process. The plea agreement, as originally proposed, was filed with the court at that time. On October 18, 2013, the trial court denied the petitioner's motion for a Rule 11 hearing on the plea bargain issue. The trial court articulated the basis for its denial, as follows:

> The Court finds that Mr. James [prosecuting attorney] indicated, on October 16, 2013, that the original plea offer tendered to Defendant on June 30, 2013, was based entirely upon the initial Psychological Evaluation findings of Mr. Trainor that Defendant was not criminally responsible. Subsequently, when the results of the second evaluation, a Forensic Psychiatric Evaluation prepared by Dr. Adamski, found that in his opinion Defendant was in fact criminally responsible, the entire posture of the case and the appropriate disposition made the earlier plea offer no longer acceptable to the State.

The trial court further ruled that the State was at liberty to withdraw its plea offer "because Defendant has not yet pled guilty and because the plea offer was not approved by the Court."

The petitioner relied upon an insanity theory of defense during a two-day trial, commencing July 15, 2014. The jury convicted the petitioner of twelve counts of wanton endangerment, one count of attempted murder, and one count of fleeing in reckless indifference to the safety of others. He was sentenced on October 2, 2014. The trial court denied the petitioner's motion for a new trial on October 10, 2014, and this appeal followed.

## II. Standard of Review

The petitioner raises multiple assignments of error on appeal. This Court generally evaluates appeals under the following standard of review:

---

1. Based upon his PTSD symptoms, the petitioner had previously been placed on "weapons profile" by the military, and his access to weapons was restricted.

2. Rule 11 of the West Virginia Rules of Criminal Procedure governs plea agreements, as quoted more extensively below.

In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

Syl. Pt. 3, *State v. Vance,* 207 W.Va. 640, 535 S.E.2d 484 (2000). Because this case requires the examination and application of numerous standards of review, this Court will discuss any other appropriate standards in conjunction with analysis of the separate issues below.

### III.   Discussion

#### A.   Proposed Plea Agreement

▮ The petitioner first contends that the lower court engaged in impermissible participation in the plea bargaining process by ordering, sua sponte, the petitioner to undergo a second evaluation for competency and criminal responsibility. In support of his claim, the petitioner cites Rule 11(e)(1) of the West Virginia Rules of Criminal Procedure, providing that the court "shall not participate" in the plea discussion.[3] The petitioner contends that upon his appearance at the July 9, 2013, hearing with a signed plea agreement,[4] the trial court was obligated to accept, deny, or defer ruling on the plea. Instead, the trial court, sua sponte, ordered the second evaluation, prior to presentation of the proposed plea agreement.

The State contends the petitioner's argument is flawed because the plea agreement

was never tendered to the trial court and its terms were consequently not addressed by the court. Moreover, West Virginia Code § 27–6A–2(a) (2014), provides explicit authority for a circuit court to sua sponte order a forensic evaluation at any stage of the proceedings.

> Whenever a court of record has reasonable cause to believe that a defendant in which an indictment has been returned, or a warrant or summons issued, may be incompetent to stand trial it *shall, sua sponte* or upon motion filed by the state or by or on behalf of the defendant, *at any stage of the proceedings* order a forensic evaluation of the defendant's competency to stand trial *to be conducted by one or more qualified forensic psychiatrists, or one or more qualified forensic psychologists.* If a court of record or other judicial officer orders *both a competency evaluation and a criminal responsibility or diminished capacity evaluation,* the competency evaluation shall be performed first, and if a qualified forensic evaluator is of the opinion that a defendant is not competent to stand trial, no criminal responsibility or diminished capacity evaluation may be conducted without further order of the court. The initial forensic evaluation may not be conducted at a state inpatient mental health facility unless the defendant resides there.

West Virginia Code § 27–6A–2(a) (emphasis provided).

The petitioner cites *State v. Sanders,* 209 W.Va. 367, 549 S.E.2d 40 (2001), as support for his argument that the Trainor report was sufficient and the referral for a second evaluation was erroneous. In *Sanders,* however, this Court merely explained that a court is not *required* to conduct a second *competency*

---

**3.**  The full text of Rule 11(e)(1) provides:

In General. The attorney for the state and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the state will do any of the following:

(A) Move for dismissal of other charges; or

(B) Make a recommendation or agree not to oppose the defendant's request, for a particular sentence, with the understanding that

such recommendation or request shall not be binding upon the court; or

(C) Agree that a specific sentence is the appropriate disposition of the case; or

(D) Agree not to seek additional indictments or informations for other known offenses arising out of past transactions.

The court shall not participate in any such discussions.

**4.**  The plea agreement was in the form of a signed letter from the prosecutor to defense counsel. The petitioner also signed the letter.

hearing when a defendant has already been found to be competent to stand trial "unless it is presented with new evidence casting serious doubt on the validity of the earlier competency finding, or with an intervening change of circumstance that renders the prior determination an unreliable gauge of present mental competency." *Id.* at 379, 549 S.E.2d at 52.

This Court finds *Sanders* inapposite. First, it does not stand for the proposition that a trial court is *limited* to ordering only one psychological evaluation or that the provisions of West Virginia Code § 27–6A–2(a) are suspended subsequent to the receipt of the first evaluation. Second, it does not address the situation, as encountered in this case, where a trial court deems a second evaluation necessary to properly assess a defendant's criminal responsibility for his actions.[5]

During the July 1, 2013, hearing, the trial court was informed that a plea agreement was being negotiated and that such agreement would be specifically premised upon the theory that the petitioner was not guilty by reason of temporary insanity. At that hearing, counsel for the petitioner indicated that "[i]t's a question of criminal responsibility at the time of the offense; and that is why he would be pleading to not guilty by reason of insanity, which just happens to be a temporary insanity. . . ." The trial court was candid with the parties, explaining: "I don't know. I'm—I'm going to have to familiarize myself with the law on this." The court also opined: "I want to review the law on that. It's lengthy and complicated . . . and I want to look at this to make sure we're approaching

this in the right way." Likewise, during the July 9, 2013, hearing, the trial court articulated its concern: "Given the nature of what has happened in this case and all these wanton endangerments and attempted murders . . . I think we need that other examination also."

■ The State argues, and this Court agrees, that the trial court did not abuse its discretion by ordering a second evaluation.[6] The primary fallacy in the petitioner's argument is that the trial court did *not* "participate" in the plea discussion, as the petitioner suggests. The trial court's requirement of a second evaluation is not tantamount to participation in the plea discussion, as prohibited by Rule 11(e)(1). It merely exercised its right, under West Virginia Code § 27–6A–2(a), to order an additional evaluation. Requiring an additional evaluation was within the discretion of the trial court, under the circumstances of this case, and this Court will not disturb the trial court's resolution of this issue.

### B. Sanity at Time of Conduct

■ The petitioner also contends that the trial court erred in permitting the guilty verdict to stand where the State failed to prove the petitioner's sanity at time of criminal conduct. In syllabus point two of *State v. Myers,* 159 W.Va. 353, 222 S.E.2d 300 (1976), *overruled on other grounds by State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995), this Court articulated the standard applicable to this issue:

> When a defendant in a criminal case raises the issue of insanity, the test of his

---

5. The case sub judice is similar to *State v. Reid,* 213 S.W.3d 792 (Tenn.2006), in which the defendant argued that the trial court erred in ordering a second forensic evaluation on the issue of competency. *Id.* at 830. The Supreme Court of Tennessee approved the conclusion of the Court of Criminal Appeals with regard to its examination of Tennessee Code § 33–7–301, permitting a court, upon its own motion, to order an evaluation of competency or mental capacity at the time of commission of the crime. Despite the absence of statutory language specifically authorizing a second evaluation, the Supreme Court affirmed the appellate court holding that the trial court was within its discretion to order a second evaluation. 213 S.W.3d at 830–31.

6. This Court's analysis of the petitioner's claim of error on the plea agreement issue also encompasses the petitioner's second assignment of error regarding the denial of the Rule 11 hearing. As explained in the October 18, 2013, order denying the petitioner's request for a Rule 11 hearing, no violation of Rule 11 occurred "because the plea was not tendered and the terms of a finalized plea agreement were not addressed prior to or at the July 9th hearing." Consequently, we find that no error was committed on this issue.

responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform his act to the requirements of the law, and it is error for the trial court to give an instruction on the issue of insanity which imposes a different test or which is not governed by the evidence presented in the case.

Furthermore, "[t]here exists in the trial of an accused a presumption of sanity. However, should the accused offer evidence that he was insane, the presumption of sanity disappears and the burden of proof is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense." Syl. Pt. 6, *State v. McWilliams*, 177 W.Va. 369, 352 S.E.2d 120 (1986) (quoting Syl. Pt. 2, *State v. Milam*, 163 W.Va. 752, 260 S.E.2d 295 (1979)). "The defendant who raises the issue of his insanity at the time of the commission of the act carries the burden of proving that defense by a preponderance of the evidence[.]" *Myers*, 159 W.Va. at 354, 222 S.E.2d at 302, syl. pt. 3.

The petitioner argues that he properly established an insanity defense through the expert testimony of Mr. Trainor and Dr. Barnet D. Feingold, a clinical psychologist, thus imposing a burden upon the State to prove beyond a reasonable doubt that the petitioner was sane at the time of the criminal conduct. To the contrary, the State argues that a detailed analysis of the testimony reveals the petitioner's failure to overcome the presumption of sanity. Moreover, the State argues that *even if* the petitioner's evidence could be deemed sufficient to overcome the presumption of sanity, the State proved beyond a reasonable doubt, through the testimony of Dr. Adamski, that the petitioner was sane at the time of the criminal conduct.

The precise issue addressed by the experts was whether, at the time of the offenses, the petitioner was suffering from PTSD to the extent that it caused a lack of capacity either to appreciate the wrongfulness of his action or to conform his action to the requirements of the law. Mr. Trainor was asked whether he had an opinion "regarding whether or not [the petitioner's] capacity to appreciate the difference between right and wrong was severely diminished or impaired due to the post-traumatic stress disorder coupled with alcohol consumption[.]" Mr. Trainor responded:

> So let me qualify my statement there. One would be, you know, a complete or nearly complete inability, which would fit the standard for, you know, not guilty by reason of insanity, and I did not feel that [the petitioner] reached that level of disability, that he was just completely not responsible for himself.

On cross-examination, Mr. Trainor further testified that although the petitioner's status did not rise to the level of insanity, he may have some diminished capacity.

Dr. Feingold testified on direct examination "that [the petitioner's] actions were shaped by his posttraumatic stress disorder and more broadly by his experiences in Iraq." When questioned on the issue of criminal responsibility, Dr. Feingold testified,

> To the best of my understanding of criminal responsibility, yes, it's my opinion that, again, his PTSD and drinking came together to cause him to lose an accurate, you know, to distort his sense of reality such that what he was doing and what he thought he was doing were two very, very different things.

However, on cross-examination, Dr. Feingold was asked if he agreed with Mr. Trainor's opinion that the petitioner was not insane but may have diminished capacity. In response, Dr. Feingold testified he did not know the difference between insanity and diminished capacity or between specific intent crimes and general intent crimes. Thus, the State contends that Dr. Feingold overtly demonstrated his unfamiliarity with the applicable legal standards on the issue of criminal responsibility, thus reducing his credibility.[7]

---

7. Dr. Feingold also explained that while the argument with the petitioner's wife may have reminded the petitioner of combat, he did not know whether the act of driving across Mr. Ludwick's yard was attributable to a PTSD-induced flashback. Dr. Feingold indicated that "it might

Dr. Adamski testified that the petitioner was able, at the time the offenses occurred, to appreciate the wrongfulness of his behavior and could have conformed his conduct to the requirements of the law. Explaining that he did not dispute the petitioner's diagnosis of PTSD, Dr. Adamski testified he could not "identify at any time where [the petitioner] felt that his life was in jeopardy, that his integrity was being threatened, that he was in danger of being harmed, which is an expectation for somebody who engages in a PTSD-like behavior."

The petitioner attempts to discredit Dr. Adamski's testimony by emphasizing certain perceived biases. For instance, the petitioner alleges Dr. Adamski functioned as a witness for the State in this matter and contacted the prosecutor to report his intention to find the petitioner criminally responsible. However, Dr. Adamski specifically testified that "[he] wouldn't have done that without sending a report. That's a misuse of somebody's spoken words, and they are not mine." The petitioner also criticizes Dr. Adamski's approach to the question of the petitioner's award of a Combat Infantry Badge. Dr. Adamski ultimately explained that although he did not originally have documentation to prove the petitioner had been awarded the badge, he did eventually learn of the award. He stated that the existence of a combat award did not alter his opinion of the petitioner's ability to understand his behavior at the time these crimes occurred.

■ The credibility issues raised by the petitioner were properly presented to the jury through the testimony of the witnesses. The petitioner was in no manner prevented from fully questioning the witnesses and developing his theories of the case. The credibility decisions were ultimately within the province of the jury. "Credibility determinations are for a jury and not an appellate court." Syl. Pt. 3, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). The

petitioner cross-examined Dr. Adamski regarding his alleged bias and his initial misunderstanding of the petitioner's receipt of a Combat Infantry Badge. We find the petitioner's assertions of improper bias meritless.

We further find that the jury was presented with the testimony of three experts on the issue of whether the petitioner was suffering from PTSD at the time of the crimes, such as to render him temporarily insane. He offered evidence, through the testimony of Mr. Trainor and Dr. Feingold, that he was insane. The jury apparently credited Dr. Adamski's testimony over the opinions of the petitioner's experts. We find sufficient evidence to support the jury verdict that the petitioner was sane at the time he committed these acts, and we consequently affirm the trial court on this issue.

### C. Attempted Murder

■ Although the petitioner failed to object regarding the sufficiency of the evidence to support a charge of attempted murder, he argues on appeal that the doctrine of plain error should be utilized to overturn the trial court's decision to uphold the guilty verdict on that count. The petitioner contends attempted murder is a specific-intent crime and the only evidence of malice [8] was his use of a rifle. He further contends that any inference of malice was rebutted by testimony that he did not recall pointing or firing the weapon.

The attempted murder conviction is founded on the petitioner's encounter with Mr. Slade. The petitioner fired bullets that hit the top of Mr. Slade's vehicle and the rear passenger seat. Mr. Slade specifically testified that he could hear cracks from the rifle and bullets hitting his car. He demonstrated the manner in which the petitioner shot at him and additionally testified that it was "[f]rom the hip." He also identified the resulting damage to his vehicle and specified that one of the bullets creased the top of his

be attributable to just kind of a generally impaired memory due to drinking."

**8.** This Court previously has stated that "[m]ethods for proving malice cannot be definitely prescribed because it is a subjective attitude, *State v. Gunter*, 123 W.Va. 569, 17 S.E.2d 46 (1941);

however, (malice) may be inferred from the intentional use of a deadly weapon, *State v. Brant*, [162 W.Va. 762] 252 S.E.2d 901 (1979)." *State v. Ferguson*, 165 W.Va. 529, 533, 270 S.E.2d 166, 170 (1980), *overruled on other grounds by State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983).

car and would have hit his head if it had been six inches lower. Another bullet penetrated the rear passenger seat of his car.

In syllabus point three of *Guthrie*, this Court explained the burden of a defendant challenging the sufficiency of evidence to support a conviction.

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

194 W.Va. at 663, 461 S.E.2d at 169. Furthermore, the function of this Court, in reviewing the sufficiency of evidence, is to "examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt." *Id.* at syl. pt. 1, 461 S.E.2d 163. In such inquiry, the evidence must be viewed "in the light most favorable to the prosecution[.]" *Id.*

We find the petitioner's argument on insufficiency of evidence of attempted murder unavailing, and we decline to invoke the plain error rule on this issue. The plain error doctrine is to be used sparingly. "To trigger application of the 'plain error' doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights;

and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. Pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Furthermore, based upon the extensive evidence justifying the attempted murder conviction, even a plain error analysis would not have resulted in a finding of insufficiency of the evidence. A reasonable jury could properly find the petitioner acted maliciously [9] when he repeatedly fired his rifle at Mr. Slade, with bullets striking Mr. Slade's vehicle.

### D. Examination of Heather Ludwick; Dr. Thomas Adamski, and Dr. Barnet Feingold

The petitioner also asserts the trial court erred when it denied his motions for a mistrial following the State's examinations of three different witnesses: Heather Ludwick, Dr. Adamski, and Dr. Feingold. This Court has adamantly stated: "It has been established that '[t]he decision to declare a mistrial, discharge the jury, and order a new trial in a criminal case is a matter within the sound discretion of the trial court.' " *State v. Corey*, 233 W.Va. 297, 308, 758 S.E.2d 117, 128 (2014) (quoting Syl. Pt. 8, *State v. Davis*, 182 W.Va. 482, 388 S.E.2d 508 (1989)). "As we explained in *State v. Williams*, 172 W.Va. 295, 304, 305 S.E.2d 251, 260 (1983), '[a] trial court is empowered to exercise this discretion only when there is a "manifest necessity" for discharging the jury before it has rendered its verdict.' " 233 W.Va. at 308, 758 S.E.2d at 128.

#### 1. Heather Ludwick

With regard to Mrs. Ludwick, the petitioner contends the trial court erred by permitting the prosecution to ask whether the petitioner spoke Arabic during their encounter, whether he used military commands, and whether he mentioned aliens or spaceships.

---

9. A conviction for attempted murder does require proof of premeditation. *See State v. George*, 185 W.Va. 539, 543, 408 S.E.2d 291, 295 (1991). In syllabus point five of *Guthrie*, this Court explained the analysis of the necessary premeditation and deliberation, as follows:

Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

194 W.Va. at 664, 461 S.E.2d at 170.

The petitioner argues the prosecution had no good faith basis for such questioning.

Emphasizing the significance of whether the petitioner was suffering from PTSD at the time of the offenses, the State contends such questions were appropriately designed to elicit information to rebut the petitioner's claim that he was under the effects of PTSD. The Trainor report had also indicated that the petitioner previously used commands from his Iraq service and had spoken Arabic. Thus, the State pursued this questioning in an attempt to establish that the petitioner had not spoken Arabic or issued military commands to Mrs. Ludwick and was therefore not suffering from an episode of PTSD during the commission of the offenses.

Based upon the foundational questions of the petitioner's sanity and behavior during the commission of these offenses, we find no abuse of discretion in the trial court's denial of the petitioner's motion for a mistrial in this regard.

### 2. Dr. Thomas Adamski

The petitioner also argues that the trial court erred in failing to declare a mistrial after the questioning of Dr. Adamski. The petitioner contends that Dr. Adamski made numerous prejudicial remarks about the petitioner and questioned how someone with an IQ as low [10] as the petitioner could serve as a policeman or military officer. The State notes that the petitioner *failed to move* for a mistrial during Dr. Adamski's questioning and has consequently waived a right to raise this issue on appeal. *See Corey,* 233 W.Va. at 310, 758 S.E.2d at 130 ("Thus, a defendant who fails to make a timely motion for mistrial . . . waives the right to assert on appeal that the court erred in not declaring a mistrial[.]") (internal citation omitted). This Court finds no merit in the petitioner's claim that a mistrial should have been granted by the trial court after the questioning of Dr. Adamski, particularly in light of the petitioner's failure to request such a ruling.

### 3. Dr. Barnet Feingold

With respect to Dr. Feingold, the petitioner again contends that the trial court erred by failing to grant a mistrial when the prosecutor asked Dr. Feingold if he was aware of possible ethical violations for rendering an expert opinion without first interviewing the petitioner. In his brief, the petitioner asserts that he "retained Dr. Feingold for the sole purpose of critiquing Adamski's report, and as a potential rebuttal witness of Adamski's testimony at trial." The petitioner further contends the State was well aware of the reason for Dr. Feingold's testimony and improperly raised the issue of rendering an opinion without an underlying evaluation.

The State asserts that questions about rendering a report without interviewing the petitioner actually benefitted the petitioner by opening the door for development of Dr. Feingold's attacks upon the Adamski report. The trial court denied the petitioner's motion for a mistrial, finding that the State's questioning regarding ethical responsibilities constituted appropriate cross-examination of Dr. Feingold. The trial court explained:

> The expert was able to answer the questions, and you were permitted then a little latitude I gave you, I thought, to let you go into that about Dr. Adamski's report. And you're going to have the chance to cross-examine Dr. Adamski here directly, I believe, so I don't believe there's any harm in that. So the Court would overrule that.

Given the foregoing, this Court finds no abuse of discretion in the trial court's denial of the petitioner's motion for a mistrial based upon the questioning of Dr. Feingold. A mistrial was not necessitated by the State's questioning.

### E.  Testimony by the Petitioner's Mother

The petitioner claims that the trial court violated Rule 404(b) of the West Virginia Rules of Evidence [11] by permitting the

---

**10.** The petitioner's IQ was determined to be in the lower twenty-three percent of individuals.

**11.** Rule 404(b) of the West Virginia Rules of Evidence governs the admissibility of evidence regarding a defendant's prior crimes, wrongs or acts, providing as follows:

> (1) Prohibited Uses. Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a

prosecutor to question his mother, Lois Fleming, about his departure from the Charlotte–Mecklenburg Police Department, a prior divorce, a prior domestic incident, anger issues, and alcohol abuse. Mrs. Fleming testified on cross-examination that she was not fully aware of the reasons for the divorce; that she thought the petitioner resigned from the police department because he moved to Maryland; and that she had no knowledge of whether alcohol was a factor in a domestic dispute involving her son.

■■■■ The State contends the petitioner waived this issue by failing to object to any alleged Rule 404(b) error. "The rule in West Virginia is that parties must speak clearly in the circuit court, on pain that, if they forget their lines, they will likely be bound forever to hold their peace." *State ex rel. Cooper v. Caperton*, 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996). Moreover, "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus Point 6, *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983)." Syl., *State v. Fox*, 207 W.Va. 239, 239, 531 S.E.2d 64, 64 (1998).

■■■■ Due to the absence of an objection, the trial court did not have an opportunity to address the issue the petitioner raises on appeal. Even if this Court were to find error in the introduction of evidence of prior employment, divorce, anger, or alcohol abuse issues, the petitioner's claims would not survive a harmless error analysis. In syllabus point two of *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), we explained that not all introduction of improper evidence will be considered reversible error.

Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

*See also* Syl. Pt. 2, *State v. Sharp*, 226 W.Va. 271, 272, 700 S.E.2d 331, 332 (2010). In this case, Mrs. Fleming was not an essential witness, and any error in admitting evidence of the petitioner's prior actions must be considered harmless.[12] The remaining evidence, including the testimony of multiple witnesses and law enforcement officials, was sufficient to support the petitioner's convictions.

F. Alleged Misconduct of Prosecuting Attorney, Denial of Fair Trial, and Sufficiency of Evidence

■■■■ The petitioner also asserts the prosecuting attorney's misconduct, as identified in the prior assignments of error, deprived the petitioner of his right to a fair trial and constituted inappropriate attacks on the petitioner's character. This Court finds no merit in the petitioner's claims of prosecutorial misconduct. He essentially reasserts prior assignments of error and contends their combined effects support his claims of prosecutorial misconduct and denial of a fair trial.

particular occasion the person acted in accordance with the character.
(2) Permitted Uses; Notice Required. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Any party seeking the admission of evidence pursuant to this subsection must:
  (A) provide reasonable notice of the general nature and the specific and precise purpose for which the evidence is being offered by the party at trial; and

  (B) do so before trial—or during trial if the court, for good cause, excuses lack of pretrial notice.

12. Although the petitioner argues that issues addressed in his mother's questioning constituted inadmissible prior bad acts, it could also be asserted that such matters were well within the ambit of addressable issues, in light of the petitioner's contention that he suffered episodes of PTSD and was temporarily insane at the time of these criminal actions.

■ We further find no merit in the petitioner's contention that the trial court should have granted his motion for judgment of acquittal based on insufficiency of evidence that these incidents occurred in Hampshire County. As the State maintains, venue was properly established by circumstantial evidence, including a map of the Capon Bridge area, the small border town where these crimes occurred. The trial court concluded that "[o]bviously, this crime occurred in Hampshire County, West Virginia, from the maps and the exhibits and the testimony that was presented today." As this Court noted in *State v. Burton*, 163 W.Va. 40, 254 S.E.2d 129 (1979), "[i]t has long been established in our law that venue can be established by circumstantial evidence." *Id.* at 58, 254 S.E.2d at 140. We find the petitioner has failed to demonstrate insufficiency in the State's evidence. When the evidence is viewed in a light most favorable to the prosecution, it is apparent the trial court did not abuse its discretion in finding proof the offenses occurred in Hampshire County, West Virginia.

■ The petitioner also includes a one sentence assertion that "Petitioner also argued that the State failed to prove that numerous counts of wanton endangerment were anything more than a simple brandishing." This Court has reiterated that "casual mention of an issue in a brief is cursory treatment insufficient to preserve the issue on appeal." *State v. Lilly*, 194 W.Va. 595, 605 n. 16, 461 S.E.2d 101, 111 n. 16 (1995) (internal quotations and citation omitted). This Court has also stated "a skeletal argument, really nothing more than an assertion, does not preserve a claim." *State Dep't v. Robert Morris N.*, 195 W.Va. 759, 765, 466 S.E.2d 827, 833 (1995) (internal quotations and citations omitted). Even if the assignment of error had been properly developed, this Court finds no merit in the petitioner's contention that the wanton endangerment charges should have been reduced to simple brandishing.

### G. Proportionality of Sentence

■ The petitioner also claims the trial court erred by sentencing him to a period of incarceration disproportionate to the underlying criminal conduct, arguing that the absence of a criminal record and his status as a combat veteran of Iraq were not properly considered. The State contends that the trial court properly evaluated the petitioner's arguments and sentenced him within statutory guidelines.[13] "The Supreme Court of Appeals reviews sentencing orders ... under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997). This Court has also specified that "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. Pt. 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982).

■ In *State v. Cooper*, 172 W.Va. 266, 304 S.E.2d 851 (1983), this Court explained "[t]here are two tests to determine whether a sentence is so disproportionate to a crime that it violates our constitution." *Id.* at 272, 304 S.E.2d at 857. "The first is subjective and asks whether the sentence for the particular crime shocks the conscience of the court and society. If a sentence is so offensive that it cannot pass a societal and judicial sense of justice, the inquiry need not proceed further." *Id.* "When it cannot be said that a sentence shocks the conscience, a disproportionality challenge is guided by the objective test we spelled out in Syllabus Point 5 of *Wanstreet v. Bordenkircher*, 166 W.Va. 523,

**13.** West Virginia Code § 61-7-12 (2014) provides a sentence of one to five years for a felony conviction of wanton endangerment involving a firearm. Of the twelve wanton endangerment counts, the trial court sentenced the petitioner to two years on two counts, three years on eight counts, and five years on two counts. West Virginia Code § 61-11-8(1) (2014) provides a sentence of three to fifteen years for a felony conviction of attempted murder. The trial court sentenced the petitioner to three to fifteen years on that count. West Virginia Code § 61-5-17(f) (2014) provides a sentence of one to five years for a felony conviction of fleeing in reckless indifference for safety of others. The trial court sentenced the petitioner to one to five years on that count.

276 S.E.2d 205 (1981)[.]" *Id.* That test provides as follows:

> In determining whether a given sentence violates the proportionality principle found in Article III, Section 5 of the West Virginia Constitution, consideration is given to the nature of the offense, the legislative purpose behind the punishment, a comparison of the punishment with what would be inflicted in other jurisdictions, and a comparison with other offenses within the same jurisdiction.

166 W.Va. at 523–24, 276 S.E.2d at 207. "While our constitutional proportionality standards theoretically can apply to any criminal sentence, they are basically applicable to those sentences where there is either no fixed maximum set by statute or where there is a life recidivist sentence." *Id.* at 531, 276 S.E.2d at 211.

In sentencing the petitioner, the trial court clearly explained that it had reviewed the investigation reports that identified the petitioner as a medium risk for another offense. The court also considered the petitioner's military record and the absence of a criminal record. The testimony and statements provided during the sentencing hearing were examined, and the court took notice of the petitioner's PTSD treatment.

The trial court ultimately sentenced the petitioner to two years for Count I (wanton endangerment); two years for Count II (wanton endangerment); three years for Count IV (wanton endangerment); three to fifteen years for Count V (attempted murder); three years for Counts VI–XII (wanton endangerment); one to five years for Count XIII (fleeing in reckless indifference); and five years for Counts XIV–XV (wanton endangerment). The trial court ordered Counts I, II, and IV to run concurrently. Counts V–XII were also to run concurrently. Those two groups of sentences were ordered to run consecutively to one another. Further, the court ordered Count XIII to run consecutively to Counts V–XII. Additionally, Counts XIV and XV were to run concurrently to each other, but consecutive to Count XIII.

In pronouncing that sentence, the trial court properly considered the petitioner's history of service, as well as the severity of his offenses. The sentences were within statutory guidelines, and the trial court did not abuse its discretion in sentencing the petitioner in that manner. The sentence does not shock the conscience of this Court or society, particularly in light of the fact that several of the sentences are to run concurrently with one another.

#### IV. Conclusion

Based upon the foregoing, this Court affirms the petitioner's convictions and the sentence imposed by the trial court.

Affirmed.