IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

September 2024 Term

**FILED**

**October 29, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-805

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

M.W.,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Wood County
The Honorable J.D. Beane, Circuit Judge
Criminal No. 19-F-296

AFFIRMED

Submitted: September 4, 2024
Filed: October 29, 2024

J. Morgan Leach, Esq.
Vienna, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Michael R. Williams, Esq.
Solicitor General
Mary Beth Niday, Esq.
Assistant Attorney General
Office of the Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error."  Syllabus Point 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

2.      "'[Subject to the provisions of W.Va.Code, 49–5–1(d),] [t]here is no constitutional impediment which prevents a minor above the age of tender years solely by virtue of his minority from executing an effective waiver of rights; however, such waiver must be closely scrutinized under the totality of the circumstances.' Syllabus Point 1, as modified, *State v. Laws*, 162 W.Va. 359, 251 S.E.2d 769 (1978)."  Syllabus Point 3, *State v. Howerton*, 174 W. Va. 801, 329 S.E.2d 874 (1985).

3.      "The validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding the waiver, and the presence or absence of the parents is but one factor to be considered in reaching this determination."  Syllabus Point 1, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

i

4. "Where neither legal counsel nor the parents are present during interrogation, the greatest care must be taken by the trial court to assure that the statement of the juvenile is voluntary, in the sense not only that it was not coerced or suggested, but that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." Syllabus Point 2, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

5. "There are three components of a constitutional due process violation under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982):(1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must have been material, i.e., it must have prejudiced the defense at trial." Syllabus Point 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

6. "The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt." Syllabus Point 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

WALKER, Justice:

In May 2019, Robert and Charlotte Taylor died in a fire at their home in Davisville. Law enforcement interviewed the Taylors' daughter, sixteen-year-old M.W., at the fire scene. During the forty-two-minute interview, M.W. confessed to using gasoline to start the fire. Later, M.W. was indicted for first-degree murder for the deaths of the Taylors, attempted murder of a child injured in the fire, and arson. M.W. moved to suppress the confession, arguing both that she had not voluntarily waived her *Miranda*[1] rights and that she had made the confession involuntarily. The circuit court denied the motion and the case proceeded to trial, where the only issue presented to the jury was M.W.'s sanity at the time she started the fire. The jury returned guilty verdicts on all counts. M.W. now appeals, and we affirm. The totality of the circumstances surrounding her interview demonstrate that M.W. intelligently, knowingly, and voluntarily waived her *Miranda* rights and that her confession was not coerced—despite her youth.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At approximately 12:30 a.m. on May 5, 2019, Deputy Fire Marshal Jason Baltic learned of a house fire in Davisville causing injuries to three people. By the time Baltic reached the hospital where the victims were being treated, Robert and Charlotte Taylor were dead. The third victim, a child, was being treated for smoke inhalation.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Baltic next went to the fire scene, the Taylors' home. Upon arriving, Baltic was informed that an odor of gasoline was detectable within the house; that "Styrofoam cups, the tops of them, the rings, that appeared to have been melted by putting some type of material like gasoline when you put it in a Styrofoam cup" had been found in a trashcan and that a two-and-a-half-gallon gas can had been found by the backdoor.

The sheriff pointed out M.W., the Taylors' sixteen-year-old daughter,[2] standing across the street on a neighbor's porch. M.W. had been in the house when the fire started and later stated that, upon hearing a "boom" in the house, she ran to a neighbor's house and telephoned 911. Baltic introduced himself to M.W. and asked if she would speak with him. M.W. agreed.

Baltic walked with M.W. to his truck, which "was setting out on the street just away from the neighbor's house . . . ." At Baltic's request, Deputy Sheriff Tasha Hewitt joined him. Baltic sat in the driver's seat, M.W. sat in the passenger's seat, and Hewitt sat in the rear seat. Baltic then read M.W. the *Miranda* warning "directly" from a card that "list[s] out each individual right under – that's guaranteed under *Miranda*[.]"[3] According to Baltic, M.W. acknowledged each of the rights as he read them and did not

_____

[2] Charlotte Taylor was M.W.'s biological, paternal grandmother. Mr. and Mrs. Taylor adopted M.W. after the death of M.W.'s biological father and the termination of her biological mother's parental rights.

[3] This card was admitted into evidence at the subsequent suppression hearing.

ask questions. M.W. appeared neither "under the influence" nor disoriented to Baltic, nor did it seem to Baltic that she did not understand the *Miranda* warning as he had read it to her. According to Baltic, M.W. neither requested an attorney nor indicated that she did not want to speak to him, during the interview that followed.

At this point—now roughly 3:00 a.m.—Baltic started a recorded interview with M.W. that would last approximately forty-two minutes. Initially, he asked M.W. how she thought the fire started. M.W. responded that she had, "[n]o clue." As the interview progressed, Baltic discussed a range of topics, including M.W.'s difficult past (M.W.'s biological mother's parental rights had been terminated and her father had committed suicide), friction between her and Mrs. Taylor, television programs, and Baltic's family. Baltic later testified that he had taken several classes on interviews/interrogations, and that "[w]hether it's a witness, a suspect, or anybody, that's one thing you want to do is build a rapport with people."

Baltic asked M.W. questions to the effect of who she thought had started the house fire, what should happen to the person who started the fire (if, in fact, someone had set the fire), and whether she had set fire. His tone remained steady and calm throughout the interview, as did M.W.'s. At one point in the interview, M.W. told Baltic that she was cold, despite being in the truck. Baltic responded that he was "burning up."

3

Roughly thirty minutes into the interview, Baltic told M.W. that he could "read people," and that he thought M.W. knew more than she was saying. He then told her that the "best thing" she could do was "be honest." Baltic asked M.W., "You didn't intend to hurt anybody, did you?" M.W. then asked whether she could talk to Baltic, alone. Baltic denied the request, explaining that he couldn't speak to a minor female alone, and that he didn't want to make Hewitt stand outside in the rain. He then told M.W. that, "no matter what you tell me, this is my deal" and that "we'll deal with it." He also told M.W. that "no one is going to snatch you up and throw you in jail tonight," to which M.W. responded, "You could." Baltic again asked M.W. whether she had set the fire. She responded that she had—on accident. Regardless, M.W. went on to describe how she had started the fire with gasoline. Baltic finally returned to the *Miranda* warning he had given to M.W. before the start of the interview. M.W. affirmed that she remembered and understood the *Miranda* rights, but that she still agreed to give a statement to Baltic. M.W. also agreed with Baltic that he had not threatened her or promised her anything, and that she understood that Baltic was recording her statement.

A grand jury indicted[4] M.W. in September 2019 on two counts of first-degree murder, two counts of felony murder, first-degree arson, and attempted murder, and cruelty

---

[4] Presumably, juvenile court proceedings preceded the indictment. The juvenile court record was not made part of the appendix record.

to animals.[5]  In March 2020, M.W. moved to suppress her statement to Baltic, asserting that she had not knowingly or intelligently waived her rights under either the Fifth or Sixth Amendments to the federal constitution.  The circuit court heard argument on the motion during the pretrial hearing in March 2021.  Baltic and Hewitt testified, along with M.W.'s expert psychiatrist, Dr. Roy Lubit, M.D., Ph. D., and the State's expert psychologist, Dr. Timothy Saar, Ph. D.

Dr. Lubit testified at the suppression hearing that M.W. possessed an overall I.Q. of 85,[6] had ADHD, showed unusual signs of "psychotic level thinking [during psychological testing]," "[i]ndications of feeling an evil spirit possessed her," serious thought disorganization, and thought blocking.  In his view, M.W. "would have been overwhelmed [during the interview] and her ability to remember and to think logically about the various factors she had to weigh would [have been] greatly hampered."  Dr. Lubit opined that "at the time that [M.W.] stated that she had set the fire, that she was not – she no longer appreciated the *Miranda* warning, or the meaning of what was – what she was doing – the significance of what she was doing."  Dr. Lubit also did not believe that M.W. had given the statement to Baltic voluntarily; he stated that he did "not think that [M.W.]

---

[5] Family pets were also killed in the fire.

[6] Dr. Saar testified that this is in the "low-average range," and that this IQ is "a little bit low, but not a whole lot different than some of the people you may interact with on your daily basis, depending on where you work and who you interact with."

logically decided to do it; that was not her intention going in, and that she did not want to do it, but got somehow tricked into doing it, somewhat pressured into it."

Dr. Saar opined to the contrary. According to Dr. Saar, M.W.'s IQ was "not a significant concern." He testified that her "working memory" was average, as was her processing speed, i.e., her "ability to identify and manipulate and respond to new information orally." Dr. Saar also testified that M.W. exhibited no deficits attributable to ADHD and read at a tenth-grade level. Dr. Saar acknowledged that M.W. had undergone serious trauma in the past,[7] and that she had been diagnosed with post-traumatic stress disorder in the past. But he went on to testify that "the symptoms normally present for post-traumatic stress disorder did not reveal themselves" during psychological testing. Dr. Saar also contested Dr. Lubit's view that M.W. experienced thought-blocking, or "significant, bizarre thought process[es] . . . ." Ultimately, Dr. Saar opined that M.W. knowingly, intelligently, and voluntarily waived her *Miranda* rights and voluntarily gave her statement to Baltic.

In its order denying M.W.'s motion to suppress her statement, the circuit court discounted Dr. Lubit's opinion, finding it be "speculative and of little probative value." The court also found that M.W.,

> knowingly, intelligently and voluntarily waived her rights
> under *Miranda* given the totality of the circumstances present
> including her age, education, intelligence, the time she had

---

[7] M.W. had been sexually abused by a family member.

6

after the fire and before her interrogation to consider whether she would speak to authorities and what she may say to them, the techniques used by the investigator, the length of interrogation, the time and place of the interrogation and the content of her statements.

In August 2021, the State disclosed that Hewitt had made known "during her hiring process with the Wood County Sheriff's Department . . . that she was not truthful to a family court judge during her divorce proceedings." Months later, M.W. filed an "Emergency Motion to Reconsider Order Denying Defendant's Motion to Suppress Due to Newly Discovered *Brady* Violation." The circuit court denied M.W.'s motion, finding that Baltic's "testimony was credible" and Hewitt's was unnecessary.

A trial was held in April 2022. The court first presented the jury with a series of stipulations reached by M.W. and the State. Stipulations four, five, and ten are relevant, here:

> Four, [the fire at the Taylors' house] was started by the Defendant [M.W.].
>
> Five, an accelerant, gasoline, was used to start the fire.
>
> . . . .
>
> And ten, the Defendant [M.W.] gave a statement to State Fire Marshal Jason Baltic that she started the fire. The Defendant [M.W.] intends to rely upon the defense of mental disease or defect at the time of the alleged crime. Under the law, the Defendant, who because of a mental disease or defect is unable to formulate the necessary intent required by law, suffers from diminished capacity.

7

Baltic testified for the State regarding his investigation of the fire. Following his testimony, M.W. moved for a judgment of acquittal as to the first-degree murder and animal cruelty counts of the indictment. The circuit court denied the motion. M.W. then offered testimony from Margaret Burdette, her Court Appointed Special Advocate; Ernest Douglass, her former guardian ad litem; and Dr. Lubit. Dr. Lubit testified that, to a reasonable degree of medical certainty, M.W. did not appreciate that starting the fire was wrong at the time due to her history of complex trauma and her high level of stress. He explained that,

> [s]he – my professional opinion, having worked with huge numbers of people with PTSD and knowing the literature and writing about it is that in that situation that's – few people would be able to think through. People who'd had her childhood and her traumas and that situation, sent back there [the Taylors' home], would be able to think anywhere past, "I've somehow got to get – I've got to either kill myself or light this fire," and what comes after is not going to be able to be conceived and thought about.

The State offered the rebuttal testimony of Dr. Saar. Dr. Saar agreed with portions of Dr. Lubit's testimony—for example, that M.W. had suffered trauma throughout her childhood. Dr. Saar also testified that someone could come to the reasonable conclusion that M.W. was mentally ill. But Dr. Saar also testified that "none of [his] testing gave any indication that [M.W. was] still suffering from any trauma;" that is, there was "nothing in [his] testing, and on the PTSD scale or any type of psychotic scale that says she is still exhibiting those types of responses that may impact her situation." Dr. Saar testified that he saw no "direct causation between the trauma which . . . all agreed did

8

happen to [M.W.] as a child, and her act on that night in question." Dr. Saar similarly opined that while M.W. "certainly ha[d] some" mental disease or defect, "there was no direct causation" to the act of using gasoline to set the Taylors' house on fire.

At the close of evidence, M.W. renewed her motion for judgment of acquittal, which was denied. The parties made closing arguments and the case was submitted to the jury. The jury convicted M.W. on all counts. M.W. again moved for a judgment of acquittal and for a new trial. The court denied those motions. On September 23, 2022, an order was filed sentencing M.W. to life imprisonment (Counts One and Two, first degree murder), twenty years of incarceration (Count Five, first degree arson), incarceration of no less than three years and no more than fifteen years (Count Six, attempted murder), and incarceration of not less than one year and not more than five years (Count Seven, animal cruelty), with all sentences to run consecutively. M.W. now appeals.

## II. STANDARDS OF REVIEW

M.W.'s assignments of error implicate distinct standards of review. We set forth those standards when analyzing each assigned error.

## III. ANALYSIS

M.W. challenges the circuit court's denial of two pretrial motions: her initial motion to suppress her statement to Baltic and subsequent motion for reconsideration.

M.W. also challenges the denial of post-trial motions. We address the pretrial motions, first, then consider post-trial matters.

## A.      Motion to Suppress Confession

M.W. first argues that the circuit court erroneously denied her motion to suppress her statement to Baltic. M.W. argues that "[b]ased on the totality of the circumstances, Baltic was required to provide additional protections to ensure that [M.W.] could understand and waive her *Miranda* rights." M.W. argues that she was not afforded those "additional protections" because, for example, Baltic did not inform her of the nature of the charges she faced, or that she might be tried as an adult. M.W. also points out that Baltic did not advise her that she could have an adult—such as a parent, guardian, neighbor, or friend—with her during the interview. M.W. also argues that Baltic used "coercive tactics" to elicit her confession, including duplicitously building a rapport with her, rejecting her claim that she knew nothing about how the fire started, and making false promises.

The State responds that M.W. was not in custody when interviewed by Baltic, meaning that M.W. was not entitled to a *Miranda* warning and that waiver is a non-issue. Barring that, the State argues that M.W. knowingly, intelligently, and voluntarily waived her *Miranda* rights—she was not under the influence when interviewed by Baltic, was oriented to time and place, affirmed that she understood her rights as read to her, and did not ask to end the interview. The State also argues that "the interviewing techniques

10

Deputy Baltic utilized did not in any manner affect the voluntariness or reliability of [M.W.'s] confession."

While presented in a single assignment of error, we understand M.W.'s challenge to the denial of her motion to suppress to raise two questions:[8] (1) whether M.W. voluntarily waived her *Miranda* rights; and (2) whether M.W.'s confession to Baltic was coerced, in violation of her rights under the Due Process Clause of the Fourteenth Amendment.[9] This Court has held that,

> [w]hen reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues. Therefore, the circuit court's factual findings are reviewed for clear error.[10]

---

[8] *See State v. Campbell*, 246 W. Va. 230, 235, 868 S.E.2d 444, 449 (2022) (observing that "the question of the voluntariness of a waiver of *Miranda* rights is separate and differs from the determination of the voluntariness of a confession") (cleaned up); *see also* Syl. Pt. 7, *State v. Bradshaw*, 193 W. Va. 519, 457 S.E.2d 456 (1995) ("When evaluating the voluntariness of a confession, a determination must be made as to whether the defendant knowingly and intelligently waived his constitutional rights *and* whether the confession was the product of an essentially free and unconstrained choice by its maker.") (emphasis added).

[9] It is unnecessary to address the State's argument that M.W. was not subject to a custodial interrogation that would require a *Miranda* warning. As discussed above, we see no clear error in the circuit court's finding that Baltic informed M.W. of her *Miranda* rights. And we conclude that M.W. knowingly, intelligently, and voluntarily waived those rights under the totality of the circumstances surrounding the interview. So, we would affirm the circuit court's denial of M.W.'s motion to suppress even if M.W. had been subject to a custodial interrogation.

[10] Syl. Pt. 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

11

Similarly, this Court will not disturb "[a] trial court's decision regarding the voluntariness of a confession . . . unless it is plainly wrong or clearly against the weight of the evidence."[11]

But "[i]t has also been held by this Court that 'we review *de novo* questions of law and the circuit court's ultimate conclusion as to the constitutionality of the law enforcement action.'"[12] Finally, "[t]his Court is [also] constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination."[13]

### 1. *Miranda Waiver*

Generally, statements made by defendants during custodial interrogations may not be used by the prosecution unless it "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."[14] Under *Miranda*, that means that the prosecution must demonstrate that "the person [was] warned that he has

---

[11] Syl. Pt. 1, in part, *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994) (cleaned up).

[12] *State v. DeWeese*, 213 W. Va. 339, 344, 582 S.E.2d 786, 791 (2003) (quoting *State v. Lilly*, 194 W. Va. 595, 600, 461 S.E.2d 101, 106 (1995)).

[13] Syl. Pt. 2, in part, *Farley*, 192 W. Va. at 247, 452 S.E.2d at 50.

[14] *Miranda*, 384 U.S. at 444.

a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[15] But "[t]he defendant may waive [those] rights, provided the waiver is made voluntarily, knowingly and intelligently."[16]  A defendant does not bear the burden of showing that his or her putative waiver was *not* made voluntarily, knowingly and intelligently; rather, the burden falls on "the State [to] prove, at least by a preponderance of the evidence, that a person under custodial interrogation has waived the right to remain silent and the right to have counsel present."[17]

Relevant to facts of this case, this Court has held that a minor may waive those rights safeguarded by *Miranda*:

> "[Subject to the provisions of W.Va.Code, 49–5–1(d),] [t]here is no constitutional impediment which prevents a minor above the age of tender years solely by virtue of his minority from executing an effective waiver of rights; however, such waiver must be closely scrutinized under the totality of the circumstances." Syllabus Point 1, as modified, *State v. Laws,* 162 W.Va. 359, 251 S.E.2d 769 (1978).[18]

---

[15] *Id.*

[16] *Id.*

[17] Syl. Pt. 2, in part, *State v. Rissler*, 165 W. Va. 640, 270 S.E.2d 778 (1980).

[18] Syl. Pt. 3, *State v. Howerton*, 174 W. Va. 801, 329 S.E.2d 874 (1985).

"The validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding the waiver, and the presence or absence of the parents is but one factor to be considered in reaching this determination."[19] Other factors to be considered include "'the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.'"[20] The "possibility that the juvenile has some sort of mental incapacity," and his or her age and experience are carefully considered.[21] In sum, "a juvenile's purported waiver is accorded special consideration."[22] Those parameters set, we turn to the circumstances of this case.

At the outset, we observe that the circuit court found that Baltic read a *Miranda* warning to M.W. before the interview. While M.W. intimates in her brief on appeal that this factual finding is suspect, we see no clear error in the circuit court's finding. At the suppression hearing, Baltic offered unrebutted testimony that he informed M.W. of her *Miranda* rights before beginning to interview her. He also testified as to the form of

---

[19] Syl. Pt. 1, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995); *see also* Syl. Pt. 3, *id*. ("The absence of a parent or counsel when a juvenile waives his rights is not necessarily a bar to a voluntary *Miranda* waiver and ultimately a confession.").

[20] *Id*. at 397, 456 S.E.2d at 478 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

[21] *Id*. at 398, 456 S.E.2d at 479.

[22] *Id*.

14

the warning by way of the card (admitted to evidence) that "list[s] out each individual right under – that's guaranteed under *Miranda*[.]" In addition, the court heard the exchange between Baltic and M.W. at the conclusion of the interview. In that exchange, M.W. confirmed that she had been informed of her *Miranda* rights. In view of that unrebutted evidence, we reject M.W.'s challenge to the circuit court's finding that Baltic advised her of the *Miranda* rights before interviewing her.

As to M.W.'s waiver of her *Miranda* rights, we first list those considerations that cut against the conclusion that any waiver was knowing, intelligent, and voluntary. M.W. was a minor at the time of the interview. Baltic did not obtain a written waiver from M.W. There is no evidence that Baltic offered to locate a "friendly adult" to sit in on the interview, explicitly informed M.W. that she was under suspicion of arson and murder, or that M.W. had experience with the criminal justice system. Finally, Dr. Saar and Dr. Lubit agreed that M.W. suffered from mental illness.

Despite those considerations, the totality of circumstances in this case demonstrates that M.W. waived her *Miranda* rights. First, Baltic read a *Miranda* warning to M.W. As Baltic testified during the suppression hearing, M.W. acknowledged those rights as they were read to her. She did not appear intoxicated. And she appeared oriented to time and place, despite the early morning hour of the interview. Second, M.W. was sixteen-years old when interviewed. While a sixteen-year-old girl is not an adult, common

15

sense tells us that she is not a ten-year old, either.[23] Third, a written waiver is not "invariably necessary . . . in order that it may be properly concluded as a matter of law that the person has waived the right to counsel . . . or has waived the right to remain silent . . . ."[24]

Fourth, while Baltic did not offer to locate a "friendly adult" to sit in on the interview with M.W., it is also true that M.W. did not ask for one. Baltic faced the practical problem of locating an adult to accompany M.W.—the Taylors had perished, M.W.'s biological father was dead, and M.W.'s biological mother's parental rights were terminated. There is some indication in the record that M.W. had a relationship with her maternal aunt and uncle, yet M.W. did not ask Baltic to contact them. Fifth, it would have been apparent to M.W. that Baltic wished to question her about the fire because he approached her at the fire scene mere hours after she called 911.

And, despite a lack of experience with the criminal justice system, M.W. demonstrated an understanding of the seriousness of the interview with Baltic—including

---

[23] *See J.D.B. v. North Carolina*, 564 U.S. 261, 280 (2011) (in the context of the *Miranda*-custody inquiry, commenting that "common sense" shows "that a 7–year–old is not a 13–year–old and neither is an adult"); *see also Fare*, 442 U.S. at 726–27 (sixteen-year-old voluntarily and knowingly waived his Fifth Amendment rights); *Sugg*, 193 W. Va. at 394, 456 S.E.2d at 475 (seventeen-year-old); *see also State v. Coleman*, No. 19-1087, 2021 WL 197341, at *6 (W. Va. Jan. 20, 2021) (memorandum decision) (circuit court's decision that seventeen-year old waived his Fifth and Sixth Amendment rights was not "plainly wrong or clearly against the weight of the evidence").

[24] Syl. Pt. 1, in part, *Rissler*, 165 W. Va. at 640, 270 S.E.2d at 778.

16

its potential consequences. We see that in this exchange: Baltic told M.W. that "no one is going to snatch you up and throw you in jail tonight," to which M.W. responded, "You could." Regardless of that awareness, M.W. continued to answer Baltic's questions and went on to admit that she started the fire. So, while M.W. may not have had experience with the criminal justice system, she was certainly attuned to Baltic's function, her position relative to him, and her exposure should she continue to answer his questions.

We acknowledge that M.W.'s expert witness, Dr. Lubit, testified at the suppression hearing that M.W. would have been overwhelmed during the interview, and her ability to think logically was "hampered." At that hearing, Dr. Lubit also testified that M.W. showed unusual signs of "psychotic level thinking [during psychological testing]," "[i]ndications of feeling an evil spirit possessed her," serious thought disorganization, and thought blocking. But the circuit court also heard the contrary testimony of Dr. Saar. He testified that M.W.'s IQ was "not a significant concern," her "working memory" and "ability to identify and manipulate and respond to new information orally" were average, she read at a tenth-grade level, and she did not show deficits attributable to ADHD.[25] In

_____

[25] Dr. Saar also testified that,

> we know research-wise, those under the age of 13 can have the most difficulty with *Miranda* rights. We know that those with the IQ below 70 tend to happen to mistake *Miranda* rights. [M.W.] doesn't have that. She's 15 points above that with regard to that.

17

weighing the testimony of Dr. Saar and Dr. Lubit, the circuit court ultimately found Dr. Lubit's "conclusions . . . speculative and of little probative value." We will not disturb that credibility finding on appeal.

While "a juvenile's purported waiver [of *Miranda* rights] is accorded special consideration,"[26] "[t]he validity of [that] waiver . . . should be evaluated in light of the totality of the circumstances surrounding the waiver . . . ."[27] Construing all facts in the light most favorable to the State while affording M.W. the "special consideration" due to a juvenile, we concur with the circuit court that the State presented at least a preponderance of evidence demonstrating that M.W. intelligently, knowingly, and voluntarily waived her *Miranda* rights, given the totality of the present circumstances.

### 2. *Voluntariness*

---

> So some of the initial red flags that have concerns about adolescents were not present, although certainly we did a look at those and that's we looked at the interaction between [M.W.] and the fire marshal.

In noting this portion of Dr. Saar's testimony during the suppression hearing, we do *not* adopt any sort of brightline standard as to IQ or age regarding a minor's ability to understand his or her *Miranda* rights. Instead, we highlight this testimony to demonstrate that Dr. Saar considered whether "red flags" associated with adolescents were present in M.W.'s case.

[26] *Sugg*, 193 W. Va. at 398, 456 S.E.2d at 479.

[27] Syl. Pt. 1, in part, *id.*

We now turn to the second question raised by M.W.'s challenge to the denial of her motion to suppress: whether her confession was coerced, in violation of her rights under the Due Process Clause of the Fourteenth Amendment. In *State ex rel. DeChrisopher v. Gaujot*, we discussed the prohibition on the use of coerced confessions at trial:

> The use of an involuntary statement or confession by a defendant in a criminal trial is a violation of the Fourteenth Amendment to the United States Constitution . . . . The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case. Coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. Police coercion includes not only physical abuse or threats directed at a suspect but also forms of psychological coercion.[28]

"In determining the voluntariness of a confession, the trial court must assess the totality of all the surrounding circumstances."[29] "[S]ome important factors bearing on voluntariness include actual threats or physical intimidation, mental coercion, the length and form of confinement, deceptions, inducements, and/or other forms of psychological pressure."[30]

And in considering the voluntariness of a juvenile's confession,

> [w]here neither legal counsel nor the parents are present during interrogation, the greatest care must be taken by the trial court to assure that the statement of the juvenile is voluntary,

---

[28] *State ex rel. DeChristopher v. Gaujot*, 244 W. Va. 631, 640, 856 S.E.2d 223, 232 (2021) (cleaned up).

[29] Syl. Pt. 7, in part, *Farley*, 192 W. Va. at 247, 452 S.E.2d at 50.

[30] *Bradshaw*, 193 W. Va. at 534, 457 S.E.2d at 471.

in the sense not only that it was not coerced or suggested, but that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair.[31]

M.W. argues that Baltic engaged in coercive interview practices so that she ultimately confessed against her will and her confession was inadmissible at trial. M.W. asserts that Baltic promised her that she would not go to jail and assured her that "no one is going to get on you or be mad at you" if she confessed. M.W. also highlights that Baltic told her that it was "best to tell the truth," then informed her that he thought she was not telling him everything she knew about the fire. According to M.W., Baltic used a "paternalistic approach," lulling her into a false sense of security by assuring her that the investigation was "[his] deal." M.W. also points out that she told Baltic eight or nine times that she did not start the fire or know how it started, yet he continued to ask her questions.

The State responds, and we agree, that M.W.'s confession was not the product of coercion given the totality of the present circumstances.[32] While recognizing M.W.'s age and general lack of experience with law enforcement, we cannot say on the record before us that Baltic's skilled questioning of M.W. crossed a constitutional line.

---

[31] Syl. Pt. 2, *Sugg*, 193 W. Va. at 388, 456 S.E.2d at 469.

[32] *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) (stating that "'[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was "compelled" despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare'") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984)).

20

Baltic informed M.W. of her *Miranda* rights. She was interviewed while sitting in the passenger of Baltic's truck, near to the neighbor's house and out of the elements. The interview was brief, lasting roughly forty-two minutes. Baltic built a rapport with M.W., a technique he testified to using "[w]hether it's a witness, a suspect, or anybody . . . ." When M.W. denied knowing how the fire started or starting itself, Baltic did not raise his voice or threaten her. Instead, he continued the interview, calmly pushing back at times to test M.W.'s evolving explanation of the fire's start.

Dr. Saar testified that M.W.'s IQ was "not a significant concern," she read at a tenth-grade level, and she exhibited no deficits attributable to ADHD. Further, the circuit court found M.W. to have been "articulate and poised" throughout the interview, and that she responded to Baltic's questions "with a calm voice displaying no stress and also in a conversational tone." The circuit court also found that "M.W. [was] not 'tricked' or 'lulled' by investigator Baltic's seemingly benign, non-aggressive interrogation style and she [thought] through the meaning and significance of her responses." Given those factual findings and others regarding M.W.'s demeanor during the recorded interview, and in the specific circumstances of this case, we reject M.W.'s argument that the manner in which Baltic conducted the interview—building a rapport, encouraging truthfulness, and suggesting to M.W. that no one would be mad at her—overbore her will.[33] Similarly, we

---

[33] *See State v. Leland*, 2020 WL 1231712, *3 (W. Va. March 13, 2020) (memorandum decision) (finding petitioner's statement to have been voluntary where interviewer first built rapport with petitioner then provided petitioner an opportunity to

21

do not see that the "paternalistic approach" employed by Baltic did, either, because M.W. raised the possibility that Baltic could take her into custody immediately before she admitted to starting the fire. In short, following a de novo review of the circumstances surrounding M.W.'s confession, we conclude that it was made voluntarily and not in violation of the Fourteenth Amendment. Consequently, we affirm the circuit court's order denying M.W.'s motion to suppress her confession to Baltic.

## B.     *Emergency Motion to Reconsider*

To refresh, in August 2021, the State disclosed that Hewitt had made known "during her hiring process with the Wood County Sheriff's Department . . . that she was not truthful to a family court judge during her divorce proceedings." The following October, M.W. filed an "Emergency Motion to Reconsider Order Denying Defendant's Motion to Suppress Due to Newly Disclosed *Brady* Violation," arguing that the State's late disclosure amounted to a constitutional due process violation under *Brady v. Maryland*,[34] in the context of the suppression hearing. M.W. argued further that Hewitt's past untruthfulness undercut her testimony at the suppression hearing to the point that "the State [could not ]meet its burden to establish that [M.W.] was read her *Miranda* rights,

---

admit his mistakes so that he could be remembered for "'all the good things'" that he did); *see also* Syl. Pt. 7, in part, *Farley*, 192 W. Va. at 247, 452 S.E.2d at 50 (holding that "[r]epresentations or promises made to a defendant by one in authority do not necessarily invalidate a subsequent confession").

[34] *Brady v. Maryland*, 373 U.S. 83 (1963).

22

understood them, and knowingly and intelligently waived the same." The circuit court denied that motion.

M.W. now argues that the circuit court abused its discretion by failing to allow her to "examine [Hewitt] regarding the nature of the *Brady* violation and . . . denying [M.W.] the opportunity to challenge [Hewitt's] credibility . . . ." The State responds that it is unclear whether *Brady* applies to suppression hearings,[35] and that even if it does, the information disclosed by the State was only marginally material in view of Baltic's testimony. M.W. does not reply to the State on this issue.[36]

This Court has held that,

> [t]here are three components of a constitutional due process violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982): (1) the evidence at issue must be favorable to the defendant as exculpatory or impeachment evidence; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and

---

[35] *See United States v. Luna*, 439 F. Supp. 3d 1243, 1247 n.1 (D.N.M. 2020) (noting that "courts 'have split' on the issue of disclosure before a suppression hearing") (quoting *United States v. Harmon*, 871 F. Supp. 2d 1125, 1168 (D.N.M. 2012), *aff'd*, 742 F.3d 451 (10th Cir. 2014)).

[36] *See* Syl. Pt. 7, *State v. Black*, 227 W. Va. 297, 708 S.E.2d 491 (2010) ("A claim of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), presents mixed questions of law and fact. Consequently, the circuit court's factual findings should be reviewed under a clearly erroneous standard, and questions of law are subject to a *de novo* review.").

23

(3) the evidence must have been material, i.e., it must have prejudiced the defense at trial.[37]

With regard to the third element—materiality—we have stated that, "the suppressed evidence is material only if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different, i.e., whether the whole case would have been put in a different light . . . ."[38]

Assuming without deciding that *Brady* applies to suppression hearings, we do not see that the circuit court erred when it denied M.W.'s motion to reconsider its earlier denial of her motion to suppress. In its order denying the motion, the circuit court found that Baltic's testimony "was credible and any testimony of Wood County Deputy Hewitt was not necessary," and that Baltic provided M.W. with a *Miranda* warning. Those are factual findings by the circuit court that M.W. has not demonstrated are clearly erroneous. Hewitt's testimony merely corroborated Baltic's testimony that he informed M.W. of her *Miranda* rights—disclosure of Hewitt's earlier untruthfulness would not have put the whole suppression motion in a different light. The circuit court did not err when it denied M.W.'s emergency motion to reconsider.

## C.    *Post-Trial Motions*

---

[37] Syl. Pt. 2, *State v. Youngblood*, 221 W. Va. 20, 650 S.E.2d 119 (2007).

[38] *State v. Grimes*, 226 W. Va. 411, 418, 701 S.E.2d 449, 456 (2009).

M.W. also challenges the circuit court's denial of her "Motion for Post-Verdict Judgment of Acquittal by Reason of Mental Illness" and motion for a new trial. M.W. premised both motions on the theory that the State failed to offer sufficient proof at trial that she was not suffering from a mental disease or defect when she started the fire at the Taylors' house. We apply the following standard to claims of insufficient evidence:

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.[39]

We have held that "[a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden."[40] We review a circuit court's denial of a motion for a new trial for an abuse of discretion.[41]

Regarding the question of mental disease or defect in a criminal case, we have held that "the test of [the defendant's] responsibility for his act is whether, at the time of the commission of the act, it was the result of a mental disease or defect causing the accused to lack the capacity either to appreciate the wrongfulness of his act or to conform

---

[39] Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

[40] Syl. Pt. 3, in part, *id.*

[41] *See* Syl. Pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

25

his act to the requirements of the law . . . ."[42]  Once a defendant "'offer[s] evidence that he was insane,'" the otherwise applicable "'presumption of sanity disappears and the burden of proof is on the prosecution to prove beyond a reasonable doubt that the defendant was sane at the time of the offense.'"[43]

M.W.'s sufficiency of the evidence arguments rests on two points of agreement between Dr. Lubit and Dr. Saar:  that M.W. had been traumatized and she suffered from mental illness.  Specifically, Dr. Lubit testified at trial that "to a reasonable degree of medical certainty," M.W. could not appreciate the wrongfulness of her actions when she started the fire "based on the complex trauma, the high level of stress that she was in for the moment she started the fire . . . ."  M.W. argues that not only did Dr. Saar agree that M.W. had suffered trauma, but that he also agreed that someone with a psychological profile similar to M.W.'s may not be able to appreciate the wrongfulness or criminality of their conduct.  M.W. concludes that, "[b]y the State's own expert witness agreeing that [M.W.]'s expert witness's conclusion was *reasonable*, there was *reasonable doubt* that [M.W.] had the requisite mens rea to form the intent necessary to be convicted of murder and arson."

---

[42] Syl. Pt. 2, in part, *State v. Fleming*, 237 W. Va. 44, 784 S.E.2d 743 (2016).

[43] *Id*. at 53, 784 S.E.2d at 752 (quoting Syl. Pt. 6, in part, *State v. McWilliams*, 177 W. Va. 369, 352 S.E.2d 120 (1986)).

Decisively, M.W. accounts for neither the "heavy burden" borne by a petitioner when "challenging the sufficiency of the evidence to support a conviction," nor our obligation to "review all the evidence . . . in the light most favorable to the prosecution and [to] credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution."[44] Dr. Lubit and Dr. Saar's points of agreement notwithstanding, Dr. Saar testified that "in [M.W.'s] particular case," he saw no "direct causation between the trauma which we all agreed did happen to this young woman as a child, and her act on that night in question." Dr. Saar later elaborated,

> Q:    In your testing and Dr. Lubit's report and all the – I think the correct word I've heard today is data –
>
> A:    Right.
>
> Q.    – and the interviews, is there anything that shows that [M.W.] was unable to form the necessary criminal intent, that she was unable to conform her actions with the law, or unable to appreciate the wrongfulness of her acts, the criminality of her acts?
>
> A:    Was there any indication? No, I believe she was able to form all of those. I think looking at all the data and the information and her behaviors, documented behaviors of that night, she certainly had the ability.

Viewing Dr. Saar's testimony in the light most favorable to the State and drawing all inferences in the State's favor, we conclude that a rational juror could have found M.W.'s conduct—starting the fire at the Taylors'—not to be the result of a mental

---

[44] Syl. Pt. 3, in part, *Guthrie*, 194 W. Va. at 657, 461 S.E.2d at 163.

27

disease or defect. And to the extent that the testimony of Dr. Saar and Dr. Lubit conflict, we are not entitled to set aside the jury's apparent determination of credibility expressed in the verdict; "[c]redibility determinations are for a jury and not an appellate court."[45] Ultimately, "a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt."[46] The trial record contains evidence to support the jury's verdict, so we will not reverse the circuit court's denial of M.W.'s motion for post-verdict judgment of acquittal. For the same reason, we do not see that the circuit court abused its wide discretion by denying M.W.'s motion for a new trial.

## IV. CONCLUSION

For the reasons discussed above, we affirm the circuit court's order of September 22, 2022.

AFFIRMED.

---

[45] *Id.*; *see also State v. Kinney*, 169 W. Va. 217, 221, 286 S.E.2d 398, 401 (1982) (commenting that "the State's burden of proving sanity beyond a reasonable doubt does not mean that the sanity evidence must be entirely without contradictions," and that "[i]t is [a] factual contradiction which a jury is called upon to resolve").

[46] Syl. Pt. 3, in part, *Guthrie*, 194 W. Va. at 657, 461 S.E.2d at 163.

28